In the

# United States Court of Appeals
## for the Seventh Circuit

—————————

No. 21-3061

BIRT FORD,

*Petitioner-Appellant,*

*v.*

DENNIS REAGLE,

*Respondent-Appellee.*

—————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division
No. 1:20-cv-01639 — **Richard L. Young**, *Judge.*

—————————

ARGUED APRIL 5, 2023 — DECIDED SEPTEMBER 22, 2025

—————————

Before SYKES, *Chief Judge*, and HAMILTON and BRENNAN,
*Circuit Judges*.

SYKES, *Chief Judge*. In June 2005 Birt Ford forced his way
into his estranged wife's home, threatened her with a knife,
and repeatedly sexually assaulted her. A jury in Allen
County, Indiana, found him guilty of rape, burglary, and
other crimes, and he was sentenced to 70 years in prison.
The Indiana Court of Appeals affirmed, and the Indiana
Supreme Court denied further review.

Ford petitioned for state postconviction relief in August 2007. Through his appointed postconviction counsel, he raised claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). As relevant here, he alleged that his trial attorney failed to pursue plea negotiations and made poor decisions about witness strategy at trial. Three years after filing the petition, Ford retained private counsel, and his appointed counsel withdrew. Eight years later, the private attorney also withdrew. As far as the record shows, neither attorney took any action on the petition.

At that point Ford proceeded pro se, and in November 2018 the state trial judge issued an order requiring that the postconviction petition be submitted on affidavits, as permitted by Indiana law. The judge gave Ford several months to submit affidavits and later denied his motion for court assistance when his effort to obtain an affidavit from his trial counsel failed. Ford submitted his own affidavit attesting that shortly before trial, his attorney told him that the prosecution was "willing to negotiate" and that he had instructed counsel to "see what kind of deal they would offer" but his attorney did not follow up. Ford did not say, however, that he would have pleaded guilty if the prosecution had offered a favorable plea deal. The trial court denied relief and the Indiana Court of Appeals affirmed. The Indiana Supreme Court again denied review.

Ford then sought federal habeas review under 28 U.S.C. § 2254. He requested an evidentiary hearing, but the district judge denied that request and ultimately denied the petition. The judge was concerned, however, about Ford's opportunity to fairly litigate the plea-negotiation claim given the state court's refusal to help him with evidence collection. So he

granted a certificate of appealability on that issue. We appointed pro bono counsel to assist Ford on appeal.[1] At counsel's request, we enlarged the certificate of appealability to include certain issues related to counsel's witness strategy at trial.

Having reviewed the record, we understand the district judge's concern about the lack of evidentiary development on the plea-negotiation claim. But the responsibility to develop the record rested with Ford's postconviction attorneys. They represented him for a combined period of 11 years without securing evidence from Ford's trial counsel, a necessary predicate for his *Strickland* claim. Under Supreme Court precedent, their failure to do so is attributed to Ford and does not permit us to override the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which generally bars a federal evidentiary hearing on a state prisoner's habeas claim, with only narrow and inapplicable exceptions. *See* 28 U.S.C. § 2254(e)(2); *Shinn v. Ramirez*, 596 U.S. 366, 382 (2022); *Williams v. Taylor*, 529 U.S. 420, 432 (2000). The judge therefore properly denied Ford's request for an evidentiary hearing. And because the state appellate court's decision was not unreasonable under § 2254(d)(1) or (2), the district judge also properly denied habeas relief. We affirm.

## I. Background

Our account of the facts comes from the trial evidence as described in the opinions of the Indiana Court of Appeals on

---

[1] Xiao Wang and the Bluhm Legal Clinic at Northwestern University's Pritzker School of Law accepted the appointment. Mr. Wang was assisted by law students Elaine Cleary and Samantha Reilly. They have ably discharged their duties. We thank them for their service.

direct appeal and postconviction review. *See Ford v. State* (*Ford I*), 856 N.E.2d 795 (Ind. Ct. App. 2006) (unpublished table decision); *Ford v. State* (*Ford II*), 145 N.E.3d 140 (Ind. Ct. App. 2020) (unpublished table decision). The key trial witnesses were Ford's estranged wife Yolanda, the victim of these offenses, and their teenaged daughter Laressa, who was present in the house where the offenses occurred.

At the time of the crimes, Birt and Yolanda had been together for about 20 years and married for ten. They have four children. Laressa is the oldest; she was 17 years old at the time of trial. Ford had a history of domestic abuse against his wife. In January 2005 he made a threat against Yolanda in the presence of a police officer who was helping her retrieve some personal items from the family home after she and the children moved out.

In the months that followed, Yolanda and her children lived in a women's shelter for periods of time; she eventually rented a home from the local housing authority. On May 27 Yolanda obtained a protective order prohibiting Ford from contacting her or visiting her residence. Undeterred, three days later Ford called her several times. When he learned that she was at her cousin's house, he went to that residence and forcibly tried to get her to leave with him; she sustained injuries to her arms and stomach in the scuffle.

On the evening of June 11, Yolanda put her younger children to bed and fell asleep while watching television with Laressa. She woke up to the sound of Ford kicking in her back door. She tried to call 911, but Ford snatched her phone and threw it to the floor, breaking it. Ford then grabbed a butcher's knife from the kitchen, barricaded the back door with the kitchen table, and led Yolanda to a back bedroom

and locked the door. While threatening to kill her, he ordered her to perform oral sex. At some point Ford heard sirens, so he stepped outside the bedroom to remind Laressa that "both her parents [would] be dead" if police entered the home. *Ford I*, 856 N.E.2d 795, at *1 (alteration in original). Ford then returned to the bedroom and had sex with Yolanda against her will.

The next morning Ford again had sex with Yolanda. Then, while he was showering, Yolanda and the children escaped from the home with her mother's help. Yolanda went to a sexual-assault treatment center, and an examining nurse noted that she had sustained injuries "consistent with forced penetration." *Id.*

Police interviewed Ford the same day. He admitted to many of these facts but characterized them differently. For example, although he acknowledged entering Yolanda's residence without consent, he denied kicking in the door. He admitted to grabbing the knife, but he claimed that he wanted Yolanda to stab *him* with it and said he had suggested that she do so. Finally, he admitted to twice having sex with Yolanda, but insisted that it was consensual. *Ford II*, 145 N.E.3d 140, at *2. More generally, Ford maintained that he had visited Yolanda with innocent intentions—to talk, make up, and reunite as a family.

Ford was charged with rape, burglary, criminal deviate conduct, and several other crimes. Public defender Mitchell Hicks was appointed to represent him. While most of the trial details are irrelevant for our purposes, a few deserve our attention. At the beginning of jury selection, the judge asked the lawyers to introduce themselves and their intended witnesses, thus giving the prospective jurors the opportunity

to identify potential conflicts. After Hicks introduced himself, he informed the jury that the defense intended to call Ford's sister Barbara (among other witnesses). During his opening statement, Hicks told the jury several times that Ford would testify in his own defense.

Yolanda Ford was the prosecution's first witness; she testified to the factual account we've just summarized. She was followed by her daughter Laressa, who largely corroborated her mother's account with minor variations. But Laressa lacked personal knowledge of the events in the back bedroom. Hicks's cross-examination of Laressa lasted only a few minutes. Focusing mostly on impeachment, Hicks reminded her of contradictory statements she had given to police and highlighted the differences between her testimony and her mother's. But his cross-examination also included a question about Ford's temper. Hicks asked Laressa, "You've seen your dad mad before, haven't you? He gets pretty vocal when he gets upset, doesn't he?" Laressa answered "yes."

In addition to Yolanda and Laressa, the prosecution called seven more witnesses and played a redacted portion of Ford's videotaped interview. The defense case was brief: Hicks recalled Yolanda, and his short direct examination primarily emphasized her lack of resistance against Ford's attack.

The jury found Ford guilty of five of the seven charged crimes: rape, criminal deviate conduct, burglary, criminal confinement, and invasion of privacy. The jury acquitted him of a second rape charge and a charge of interfering with a report of a crime. The judge imposed a total sentence of 70 years in prison. The Indiana Court of Appeals affirmed the

judgment on direct appeal, and the Indiana Supreme Court denied further review.

Ford then sought postconviction relief in state court, filing his petition through appointed postconviction counsel in August 2007. He raised claims under *Strickland* for ineffective assistance of counsel, alleging that his trial and appellate attorneys made numerous mistakes. As relevant here, he argued that Hicks failed to pursue plea negotiations and made several errors in witness strategy at trial.

From that point on, the record of what happened in the state trial court is almost totally silent. We know that Ford's appointed postconviction counsel withdrew in October 2010 and that retained counsel entered an appearance. The record picks up eight years later, in November 2018, when Ford's private counsel also moved to withdraw. The judge granted that motion. The State then moved to require Ford to submit his postconviction claims by affidavit, as permitted by Indiana law in this situation.[2] The judge granted that motion too. Ford moved for reconsideration. He also moved to compel the Allen County Clerk of Courts to mail him case documents and asked the court for assistance to compel Hicks to file an affidavit responding to his interrogatories. This last motion deserves some additional explanation. Ford explained that he had mailed interrogatories to Hicks but had not received a response; he attached a copy of a certified mail card as support. Several weeks later Ford also moved for a court order to depose Hicks.

The trial judge noted but took no action on Ford's reconsideration motion, took the deposition motion under advise-

---

[2] *See* IND. R. POST-CONVICTION REMEDIES 1, § 9(b).

ment, and denied the other two. Apparently unpersuaded by Ford's representations and the certified mail card (or perhaps overlooking these submissions), the judge explained that "nothing in the record" indicated that Ford had "actually requested" an affidavit from counsel. Still, the judge reserved decision on whether to hold an evidentiary hearing until after the case was submitted by affidavit.

Ford submitted his own affidavit in support of his post-conviction claims. As relevant here, he stated that Hicks had informed him shortly before trial that the prosecution was "willing to negotiate" and that he had instructed counsel to "see what kind of deal they would offer" but Hicks "never did what I requested." Ford did not say, however, that he would have acknowledged his guilt and pleaded guilty if the prosecutor had offered a favorable plea deal. Ford also stated that Hicks had not called his sister Barbara to testify even though he had told the jury that she would be a witness. Ford asserted that Barbara would have testified about Yolanda's "habit of lying to me." Ford also claimed that Hicks was ineffective for not calling him as a witness in his own defense after telling the jury that he would testify. Finally, Ford complained that Hicks's cross-examination of Laressa had "opened the door" for the prosecution to "paint a negative picture of me."

The trial judge dismissed Ford's postconviction petition. On the plea-negotiation issue, the judge concluded that because Ford had not confirmed that he would have admitted his guilt—a prerequisite for a guilty plea in Indiana, *see Norris v. State*, 896 N.E.2d 1149, 1152 (Ind. 2008)—he had not shown that "plea negotiations would have affected the outcome" of the case, as required by *Lafler v. Cooper*, 566 U.S.

156 (2012). The judge also concluded that Hicks was not ineffective for failing to call Ford's sister as a witness because her proposed character testimony would have been inadmissible. Nor could Hicks be faulted for not putting his client on the stand in his own defense because Ford had not explained how his testimony at trial would have differed from what he said in the videotaped interview. The judge did not discuss Hicks's cross-examination of Laressa.

Ford appealed, raising the same issues. Applying the *Strickland* standard, the Indiana Court of Appeals affirmed. On the issue of Hicks's failure to pursue plea negotiations, the appellate court's analysis did not track the trial judge's. Rather than resting its decision on Ford's unwillingness to admit his guilt—making it unlikely that either he or the trial court would have accepted a plea deal—the appellate court focused instead on the lack of evidence to support this claim. The court noted that no evidence beyond Ford's own "self-serving affidavit" supported his version of events, and the trial court was "no[t] oblig[ed] to credit" that version. *Ford II*, 145 N.E.3d 140, at *5. In addition, because the record lacked any evidence from Hicks, the court presumed that he "would not have corroborated Ford's account." *Id.* (citing *Oberst v. State*, 935 N.E.2d 1250, 1254 (Ind. Ct. App. 2010)). In all other relevant respects, the appellate court's reasoning aligned with the trial judge's: the panel agreed that Barbara's testimony would have been inadmissible character evidence and that Ford's testimony would have been cumulative or contradictory—and in either case, unhelpful. *Id.* at *5, *7. Like the trial judge, the Indiana Court of Appeals did not address the issue of Hicks's cross-examination of Laressa.

Ford sought review in the Indiana Supreme Court, reiter-ating most of his arguments with one notable exception: he did not renew his claim that Hicks's cross-examination of Laressa was constitutionally ineffective. Once again, the state supreme court declined review.

Ford then turned to federal court with a pro se petition for habeas corpus under § 2254. He raised the same issues (and many others since abandoned). The district judge denied relief. Starting with the plea-negotiation issue, the judge was skeptical of the state appellate court's "failure of proof" rationale, noting that Ford had "*tried* to obtain trial counsel's testimony." So the judge looked through the appellate court's opinion to the trial judge's decision, reasoning that the appel-late court had "essentially accepted" the trial court's analysis. The judge then held that the state trial judge had not unrea-sonably applied the Supreme Court's decisions in *Lafler* and the companion case of *Missouri v. Frye*, 566 U.S. 134 (2012). Not only was there "no evidence of an uncommunicated formal plea," but Ford's unwavering commitment to his innocence would have precluded an Indiana court from accepting a hypothetical guilty plea.

Turning to the cluster of issues concerning Hicks's trial performance, the judge noted some missteps in the appellate court's reasoning but nothing that provided grounds for habeas relief under § 2254(d). Relevant here, the judge held that the state appellate court had reasonably concluded that Hicks was not ineffective for failing to call Barbara Ford as a witness and likewise reasonably held that Ford was not prejudiced by his attorney's decision not to call him to testify. Finally, the judge noted that the state trial and appellate courts had overlooked the issue of Hicks's cross-examination

of Laressa. Analyzing it himself, the judge assumed without deciding that the challenged cross-examination amounted to deficient performance but concluded that it was not prejudicial based on the abundant corroborated evidence of Ford's guilt.

Still, the judge expressed concern about Ford's opportunity to "fairly litigate" the plea-negotiation issue based on the state court's "refusal to hold an evidentiary hearing or otherwise assist" him in collecting evidence. The judge concluded, however, that AEDPA barred him from holding an evidentiary hearing to develop a record for the first time on federal habeas review. But his lingering concern led him to issue a certificate of appealability limited to the plea-negotiation issue.

Ford appealed, and we appointed pro bono counsel to assist him. We later granted counsel's request to expand the certificate of appealability to include the claimed errors in witness strategy noted above.

## II. Discussion

An order granting habeas relief from a state criminal judgment "is an 'extraordinary remedy,' reserved for only 'extreme malfunctions in the state criminal justice system.'" *Brown v. Davenport*, 596 U.S. 118, 133 (2022) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 633–34 (1993)). In deference to the federalism interests of the states, and to ensure that federal habeas review does not become a "substitute for ordinary error correction through appeal," *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011), AEDPA imposes a steep standard of review when a state court has ruled on the merits of a state prisoner's federal claim, *Brown*, 596 U.S. at 125. A federal

court "shall not" grant a writ of habeas corpus unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or (2) "based on an unreasonable determination of the facts" as "presented in the State court proceeding." § 2254(d).

"Unreasonable" in this context means more than simply "wrong." The state court's decision must be "so lacking in justification that there was an error well understood and comprehended in existing law." *Harrington*, 562 U.S. at 103. Not just that—the error must be so obvious that it is "beyond any possibility for fairminded disagreement." *Id.* "By design, this is a difficult standard to meet." *Meyers v. Gomez*, 50 F.4th 628, 641 (7th Cir. 2022).

Moreover, where—as here—a state prisoner alleges a violation of his Sixth Amendment right to the effective assistance of counsel in his defense, our review is "doubly deferential" because the underlying substantive legal standard—established in the Supreme Court's decision in *Strickland*—is itself highly deferential. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. To guard against "the distorting effects of hindsight," the Supreme Court has instructed courts to "indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance"; the defendant bears the burden to overcome the presumption. *Id.*

Accordingly, on § 2254 habeas review, federal courts must indulge two presumptions: under AEDPA, we presume that the state courts "know and follow the law," *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (per curiam) (quotation marks omitted); and under *Strickland*, we presume that defense counsel "rendered adequate assistance" and "exercise[d] … reasonable professional judgment," *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quotation marks omitted). In simpler terms, we give "both the state court and the defense attorney the benefit of the doubt." *Id.* at 15.

To overcome the presumption of adequate representation, the defendant must prove that his attorney's performance was deficient—that is, that it "fell below an objective standard of reasonableness" under all the circumstances, *Strickland*, 466 U.S. at 687–88; and that counsel's deficient performance prejudiced his defense, *id.* at 692. To prove prejudice, the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

One last point: a state prisoner's federal habeas claim "is considered against the last reasoned state court decision on the merits." *Minnick v. Winkleski*, 15 F.4th 460, 469 (7th Cir. 2021). We will return to this subject in a moment.

## A. Plea-Negotiation Issue

The main issue on appeal concerns the failed plea negotiations—or more precisely, the *nonexistent* plea negotiations. Ford contends that Hicks was ineffective because he disregarded an explicit instruction from him to pursue the possibility of a plea deal.

The Sixth Amendment right to the effective assistance of counsel extends to plea negotiations, so under *Strickland* the defendant must shoulder the burden of proving that his counsel's performance with respect to plea bargaining was both objectively unreasonable and prejudicial. *Lafler*, 566 U.S. at 162–63; *see also Frye*, 566 U.S. at 140. To establish prejudice in this context, the defendant must show that but for counsel's ineffectiveness, there is a reasonable probability that (1) a favorable plea bargain would have been offered, accepted, and not later withdrawn based on intervening events; (2) the plea deal would have been accepted by the court; and (3) the resulting conviction or sentence (or both) "would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 566 U.S. at 164.

We pause here to address a threshold procedural point. Ford criticizes the district judge for "looking through" the Indiana appellate court's opinion to the trial court's decision. The Supreme Court has endorsed a "look-through" approach when the last state court decision "does not come accompanied with … reasons"—typically, when a reviewing court's decision simply says "affirmed" or "denied." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). The Indiana Supreme Court's summary denial of review certainly qualifies for this treatment, but the intermediate appellate court's decision contained a detailed, issue-by-issue analysis. So Ford's procedural point is well taken.

The district judge saw things differently. He found fault with the appellate court's rationale for rejecting Ford's claim about plea negotiations. But he determined that the appellate court had also (or perhaps alternatively) "essentially accepted" the trial judge's decision on this issue, so he shifted his

focus and considered the trial court's reasoning. Recall that the state trial judge's decision rested on the conspicuous absence of any statement from Ford that he would have pleaded guilty if a favorable plea deal had been offered. When considered against the backdrop of Ford's persistent claims of innocence—claims that under Indiana law would have foreclosed a guilty plea—this glaring omission meant that he had not shown a reasonable probability of a different result. And that, in turn, meant that Ford had failed to establish *Strickland* prejudice in the sense required by *Lafler*.

It's no surprise that the district judge found this analysis eminently reasonable. Indeed it was. Alas, nothing in the appellate court's decision suggests that the appellate panel adopted the trial judge's rationale; in fact, the court never mentioned it. Instead, the appellate court rested its decision on the lack of evidence corroborating Ford's factual narrative on the plea-negotiation claim—and most significantly, the absence of any testimony from Hicks. Because the record lacked evidence from Hicks, the appellate court presumed that the attorney would not have corroborated Ford's account. As the last reasoned state-court decision on the merits, we focus our review on the appellate court's reasons rather than the trial judge's.

Though Ford is right about this procedural point, he is wrong about its effect on the bottom line. We note for starters that the state appellate court correctly cited and applied the *Strickland* standard. Ford does not argue otherwise. Instead, he maintains that the appellate court unreasonably applied the "missing evidence" rule, a century-old common-law evidentiary presumption reflecting the common-sense inference that when a litigant fails "to bring to the support of his

defence the very best evidence … in his possession," the trier of fact may reasonably conclude that the evidence "would not be favorable to the defence." *Clifton v. United States*, 45 U.S. 242, 247 (1846). As applied to witnesses, the missing-evidence rule "permits an inference of unfavorable testimony from [a] missing witness." *Littlefield v. McGuffey*, 954 F.2d 1337, 1346 (7th Cir. 1992). But it applies only if the witness was "within the opposing party's power to produce." *Id.*

Ford contends that because the state trial court denied his pro se request for assistance in procuring Hicks's testimony, it was not just wrong for the appellate court to apply the "missing evidence" rule—it was objectively unreasonable. This argument overlooks the limits on federal habeas review of state criminal judgments. Under § 2254(d)(1), a federal court cannot set aside a state criminal judgment unless the state court's decision unreasonably applied clearly established *federal* law, as determined by the Supreme Court. In an effort to fit his case within subsection (d)(1), Ford cites the Supreme Court's decision in *Mammoth Oil Co. v. United States*, 275 U.S. 13 (1927). We're not sure why. The *Mammoth Oil* decision is simply an application of the "missing evidence" common-law presumption in a Supreme Court case; it did not establish a principle of federal law binding on the states under the Supremacy Clause.

To the contrary, the evidentiary rules used in state court are the province of *state* law; the state courts need not follow the same rules of evidence in use in the federal courts. Rather, the states have "broad latitude" to establish, interpret, and apply their own rules of evidence. *Caffey v. Butler*, 802 F.3d 884, 895 (7th Cir. 2015) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)). And that's precisely what the Indiana

Court of Appeals did in Ford's case. The court relied on a state-law evidentiary inference in its failure-of-proof analysis, citing *Oberst v. State*, 935 N.E.2d 1250, 1254 (Ind. Ct. App. 2010) ("When counsel is not called as a witness to testify in support of a petitioner's arguments, the post-conviction court may infer that counsel would not have corroborated the petitioner's allegations."). If that was an error—an issue we do not decide—it was one of state law, not federal law. Errors of state law are not cognizable in federal habeas. *Pierce v. Vanihel*, 93 F.4th 1036, 1046 (7th Cir. 2024).

Ford's fallback position is that we should set aside the appellate court's failure-of-proof rationale as an unreasonable determination of the facts under § 2254(d)(2). This recharacterization of the claim rests on Ford's contention that the state trial judge wrongly denied his requests for assistance in procuring Hicks's testimony after his retained counsel withdrew, thus leaving a gap in the state-court record. Recast in this way, the argument overlaps with Ford's argument that the district judge should have granted his motion for an evidentiary hearing to address the gap in the state-court record. Whichever way it is characterized, the argument fails to grapple with the strict limits in § 2254(d) and (e).

On federal habeas review, a state court's factual findings are "presumed to be correct," and this presumption can be overcome only by "clear and convincing evidence." § 2254(e)(1); *see also Pierce*, 93 F.4th at 1045. "This is a stringent standard"; "even if reasonable minds … might disagree" about a factual finding, "that does not suffice to supersede the [state court's] determination." *Pierce*, 93 F.4th at 1045 (internal quotation marks omitted).

More fundamentally, however, the state appellate court's analysis of the plea-negotiation claim did not turn on factual findings. The appellate court rejected Ford's claim based on the lack of an evidentiary record—most notably, the absence of any evidence from Hicks. In other words, the appellate court's decision was rooted in factual *deficiencies*, not factual *determinations*. In the absence of any factual findings, Ford cannot establish what § 2254(d)(2) requires: that the state-court decision "was based on an unreasonable determination of the facts." So § 2254(d)(2) cannot serve as a gateway to de novo review of this claim.

Equally important, § 2254(e)(2) precludes an evidentiary hearing on a state prisoner's habeas claim to address the deficiencies in the state-court record. More specifically, the statute provides that "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings," the federal court "*shall not* hold an evidentiary hearing." § 2254(e)(2) (emphasis added.) There are exceptions, but they are quite limited. When a state prisoner fails to develop the state-court record, a federal court may hold an evidentiary hearing on his habeas claim in *only* two narrow circumstances: when the claim relies on either a new and retroactive rule of constitutional law from the Supreme Court, § 2254(e)(2)(i), or "a factual predicate that could not have been previously discovered through the exercise of due diligence," § 2254(e)(2)(ii). There is an additional requirement even if one of these exceptions applies: the facts underlying the new claim must be sufficient to establish by clear and convincing evidence that "no reasonable factfinder would have found the applicant guilty," § 2254(e)(2)(B).

"Failure" in this context means a "lack of diligence, or some greater fault, attributable to the prisoner *or the prisoner's counsel*." *Williams*, 529 U.S. at 432 (emphasis added). So Ford cannot fault the state trial court for the lack of an evidentiary record on his claims. He was represented by counsel in 2007 when he filed his postconviction motion and for 11 years thereafter. His attorneys were responsible for developing a factual basis for his *Strickland* claim, but as far as the record shows, neither his appointed attorney nor retained attorney did so.[3] Their failures are imputed to Ford. *Williams*, 529 U.S. at 432.

The Supreme Court has been explicit and unequivocal on this point. "[U]nder AEDPA and [the Court's] precedents, state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner." *Shinn*, 596 U.S. at 382. Accordingly, "under § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent." *Id.* at 384. And in that situation, "a federal court may order an evidentiary hearing or otherwise expand the state-court record only if the prisoner can satisfy [one of] § 2254(e)(2)'s stringent" exceptions. *Id.*

That's what distinguishes Ford's case from *Lee v. Kink*, 922 F.3d 772 (7th Cir. 2019), which he cites as support for his argument that the district judge wrongly rejected his request

---

[3] In postargument filings, Ford identified deficiencies in his postconviction counsel's performance that likely contributed to the stagnant state-court record. His description of his retained postconviction counsel's performance is especially concerning. He explained that the Indiana Supreme Court later suspended counsel's license for misconduct in an unrelated case. *In re Welke*, 131 N.E.3d 161, 165 (Ind. 2019).

for an evidentiary hearing. In *Lee* we remanded for an evidentiary hearing on a § 2254 habeas petition because the petitioner had made "more than a dozen express requests" for an evidentiary hearing in state court, all of them ignored. *Id.* at 774. The state prisoner's repeated efforts to obtain a hearing in state court were enough to demonstrate his diligence in trying to develop a factual basis for his claims. Under these circumstances, we held that the petitioner was not at fault for the failure to develop the state-court record; the fault, we said, "must be attributed to the state judiciary's failure to afford him a hearing." *Id.*

This case is different. Here the responsibility to develop the factual record rested with Ford's postconviction counsel. His attorneys are at fault for not doing so, not the state judiciary. Under *Shinn* and *Williams*, postconviction counsel's neglect is attributed to Ford. Because their 11-year failure to act is imputed to Ford, his eleventh-hour request for court assistance after the judge ordered the case submitted on affidavits does not establish diligence under § 2254(e)(2). The district court therefore was statutorily precluded from holding an evidentiary hearing unless Ford's case qualified under one of § 2254(e)(2)'s "stringent" exceptions. *Shinn*, 596 U.S. at 384. Because neither exception in § 2254(e)(2) applies, the district judge correctly declined to hold an evidentiary hearing and properly denied relief on this claim under § 2254(d).

## B. Witness-Strategy Arguments

At Ford's request, we expanded the certificate of appealability to permit him to raise three additional *Strickland* arguments on appeal. All relate to Hicks's witness strategy at trial. We turn to those arguments now, but we can be brief.

We start with Hicks's cross-examination of Laressa, which elicited some negative information about Ford's temper. As an initial matter, the State argues that Ford procedurally defaulted this issue. State prisoners must exhaust state remedies as a prerequisite to a federal habeas petition. § 2254(b)(1)(A). To satisfy the exhaustion requirement, a habeas applicant must "fairly present his constitutional claims through at least one complete round of the state's established appellate review process." *Hicks v. Hepp*, 871 F.3d 513, 530 (7th Cir. 2017) (quotation marks omitted) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). "This includes presenting the claims to the state's highest court in a petition for discretionary review." *Id.* The failure to do so is a procedural default, which ordinarily precludes a federal court from considering the claim. *Id.* at 531.

As we've noted, Ford did not raise Hicks's cross-examination of Laressa in his petition to the state supreme court, so he indeed defaulted the issue. But procedural default is an affirmative defense that can be lost if not properly raised. *Williams v. United States*, 879 F.3d 244, 248 (7th Cir. 2018). Ford argues that the State waived the defense by not raising it in the district court. There is a potentially plausible reason for the State's failure to do so: Ford's lengthy habeas petition only briefly mentioned Laressa's cross-examination, and the issue was nested within a broader argument about Hicks's lack of preparation for trial. This framing arguably left the State without notice that the cross-examination was a discrete issue Ford intended to press.

But it's not necessary to decide the waiver question; the district judge properly rejected this claim on the merits, as the State argues in the alternative. The judge assumed for the

sake of argument that it was objectively unreasonable for Hicks to ask Laressa if Ford is "pretty vocal when he gets upset." Still, it's clear based on all the evidence that her "yes" answer was not so damaging that it affected the outcome. On this reasoning, the district judge held that this brief, if inadvisable, question on cross-examination was not prejudicial. We see no flaw in this analysis.

Ford next argues that Hicks was ineffective because he failed to put him on the stand to testify in his own defense after telling the jury that he would. The state appellate court rejected this claim, finding "no reason to believe that testifying would have helped Ford" because his side of the story was already before the jury in his videotaped police statement. The court also noted that putting Ford on the witness stand risked contradictory or impeaching testimony, as well as a potentially damaging cross-examination. The court did not specifically address the effect of Hicks's unmet promises that the jury would hear from Ford directly.

The district judge noted this oversight but nonetheless held that the state court reasonably rejected the claim based on lack of prejudice. Ford has never explained how his trial testimony would have added to, differed from, or contextualized his videotaped statement to police. Absent that explanation, and accounting for the obvious risks of subjecting himself to cross-examination, the state court's "no prejudice" ruling was not unreasonable.

Ford's final contention—that Hicks was ineffective for failing to call his sister Barbara to testify about Yolanda's character—is similarly meritless. First, Hicks never promised that Barbara would testify; he merely identified her to the jury as a potential witness. More importantly, the state appel-

late court determined that Barbara's proposed character testimony would have been inadmissible, so Hicks's decision not to call her as a defense witness was not objectively unreasonable. Accepting as we must the state court's interpretation of state evidence law, *see Miller v. Zatecky*, 820 F.3d 275, 277 (7th Cir. 2016), the court reasonably concluded that Hicks was not ineffective for failing to present inadmissible testimony. *See also Kavanagh v. Berge*, 73 F.3d 733, 736 (7th Cir. 1996) (explaining that counsel's "failure to offer inadmissible evidence is not ineffective assistance").

AFFIRMED